IN THE UNITED STATED DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Estate of Michael D. Whitmer | : | |
| by and through Chelsea O'Brien, | : | |
| Administrator of said Estate | : | |
| 96 Third Street, Apt A | : | Civil Action No. |
| Nelsonville, OH 45764 | : | |
| | : | |
| Plaintiff, | : | |
| | : | Judge |
| v. | : | |
| | : | |
| Cecil A. Morrison, IV | : | Jury Trial Demanded |
| 5855 Ireland Road, | : | |
| Coolville, OH 45723 | : | |
| | : | |
| Defendant. | : | |

**COMPLAINT WITH JURY DEMAND**

**Introduction**

1. This is an action for money damages brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution, and under the common law of the State of Ohio against Cecil A. Morrison, IV (hereinafter "Defendant Morrison") in his individual capacity, who at all relevant times was a police officer of the Hocking College Police Department. Defendant Morrison was also acting, at all relevant times, on behalf of the City of Nelsonville, Ohio pursuant to a mutual aid agreement between Hocking College and the City of Nelsonville, Ohio. Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343, and on the pendent jurisdiction of this Court to entertain claims arising under state law.

2.     It is alleged that Defendant Morrison while acting under color of state law shot and killed Michael D. Whitmer (hereinafter "Michael"), without legal cause or excuse, thereby making an unreasonable seizure of the person of Michael, violating his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

**Parties**

3.     Plaintiff Chelsea O'Brien, Administrator of the Estate of Michael D. Whitmer, is a resident of Nelsonville, Ohio and Michael's surviving spouse. Letters of Authority were granted to her by the Athens County, Ohio Probate Court on August 31, 2021.

4.     Michael was at all material times a resident of Nelsonville, Ohio and of full age.

5.     Defendant Morrison was, at all relevant times, a duly appointed and acting police officer for the Hocking College Police Department. He is sued in his individual capacity. At all relevant times, Defendant Morrison and Hocking College acted under color of state law to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of Ohio.

6.     At all times relevant, Hocking College and the City of Nelsonville, Ohio were operating under a mutual aid agreement which allowed Hocking College and Defendant Morrison to respond to calls for police services within the City of Nelsonville.

7.     The City of Nelsonville, Ohio is a political subdivision of the State of Ohio.

8.     At all times relevant, as a result of the aforementioned mutual aid agreement Defendant Morrison was also acting on behalf of the City of Nelsonville under

color of state law to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the State of Ohio.

9. Hocking College is a public technical college located in the City of Nelsonville within the State of Ohio, is part of the University System of Ohio, and was the employer of Defendant Morrison. Hocking College is a political subdivision of the State of Ohio.

**Facts**

10. At approximately 7:37 p.m. on July 27, 2021, the decedent, Michael D. Whitmer ("Michael"), was standing in the driveway of his residence at 96 Third Street in Nelsonville, Ohio about to get into his small Chevrolet sedan. He was preparing to drive to his mother's house. His is four-year-old son was seated in the rear seat on the passenger side and was properly restrained in a child car seat. It was a sunny day, the sun had not set, and the windows of the Chevrolet sedan were not tinted. The sedan was parked in the driveway of 96 Third Street with its front end facing the apartment building at 96 Third Street and its rear end facing Third Street.

11. At approximately 7:37 p.m. on July 27, 2021 Nelsonville Police officer KJ Tracy (hereinafter "Mr. Tracy") was the first law enforcement officer who had contact with Michael that evening, after he arrived at 96 Third Street, Nelsonville, Ohio.

12. Neither Mr. Tracy nor Defendant Morrison (hereinafter "Defendant Morrison") had an arrest warrant for Michael.

13. Neither Mr. Tracy nor Defendant Morrison (hereinafter "Defendant Morrison") had a search warrant to search Michael's car, home, or anything else belonging to Michael.

14. Upon arrival at the scene, Mr. Tracy lacked probable cause to arrest Michael, having a report only of raised voices coming from Michael's apartment. Nevertheless, when Michael got into the Chevrolet sedan within seconds after Mr. Tracy's arrival Mr. Tracy had already drawn his handgun, began yelling at Michael to get out of the car, and approached the driver's side door of the Chevrolet sedan, with his handgun drawn.

15. Mr. Tracy continued to yell at Michael to get out of the car with his handgun still drawn and yelled at him to show him his hands. Michael raised both of his hands at least twice revealing that his hands were empty and that he was not holding a weapon.

16. Michael rolled his window down when Mr. Tracy took a step back from his position near the driver's side door of the Chevrolet sedan and Michael attempted to say something to Mr. Tracy but could not make himself heard over Mr. Tracy's shouting.

17. Mr. Tracy continued to loudly yell at Michael to get out of the car and stepped back toward the driver's side door. Michael rolled the window most of the way back up leaving it cracked open at the top.

18. Michael then pointed backwards several times to let Mr. Tracy know he was going to back out. Mr. Tracy was still located by the driver's side door, not behind

4

the sedan. Mr. Tracy acknowledged Michael's indication that he was going to back up by shouting "No!".

19. Michael continued to try to talk to Mr. Tracy through the cracked open window but Mr. Tracy did respond, instead continuing to yell at him to get out of the car.

20. Michael got a pack of cigarettes, pulled one out, lit it, and began smoking it. His hands were visible, and he obviously had no weapon.

21. Mr. Tracy began to yell that he was going to bust the glass open, referring to the driver's side window of the Chevrolet sedan.

22. Michael, with the cigarette between two of his fingers, repeatedly put both hands up, with his hands open and his palms facing Mr. Tracy demonstrating once again that he had no weapon.

23. At about the time Mr. Tracy was yelling that he was going to bust the glass open, (at approximately 7:38 p.m.) Defendant Cecil Morrison, IV (hereinafter "Defendant Morrison") arrived at 96 Third Street to assist the Nelsonville Police Department in response to the aforementioned call regarding raised voices at Michael's apartment.

24. The call to which officers were responding made no allegations that any crime had been committed, that any weapons were present, that any physical altercation had occurred, or that any property damage had occurred. The call was from a person living in another apartment unit at 96 Third Street who claimed to have heard loud voices but had not seen anything relating to the loud voices.

25. When Defendant Morrison arrived at the scene police officers from the Nelsonville Police Department were already present and had partially blocked the

driveway of 96 Third Street with an SUV that was a Nelsonville Police Department vehicle. No one was in the NPD SUV after it was parked there. The only exit for the vehicle Michael was driving was a small gap at the end of the driveway that the NPD SUV was not blocking.

26. Defendant Morrison approached the Chevy sedan with his handgun drawn and stood near the rear driver's side of the car near Mr. Tracy pointing the gun at Michael. He yelled to Michael to get out of the car several times. Michael again held up his hands palms facing Mr. Tracy and Defendant Morrison, and with the cigarette still between his fingers. Apart from the cigarette between his fingers Michael's raised and open hands were obviously empty. He made another pointing gesture indicating he was going to back up.

27. Mr. Morrison struck the driver's window of the vehicle three times with an object he was holding in his left hand, in an apparent attempt to break the glass, but the glass did not break.

28. Michael then backed away from Mr. Tracy and Defendant Morrison toward the gap where the NPD SUV was not blocking the end of the driveway. That left Mr. Morrison standing where the car had been, unharmed, and farther away from the car than he had placed himself when he first approached.

29. Mr. Tracy pursued the vehicle on foot as it backed, placing his hands on the driver's side of the vehicle and walking and/or running alongside the car as it backed, and continued to yell for Michael to get out of the car.

30. The front passenger side of the Chevy sedan sideswiped the front end of the SUV and Michael stopped the car.

31. Michael pulled the sedan forward back into the driveway, while Defendant Morrison stayed where he was, unharmed.

32. Michael backed up again and the rear of the sedan struck the front passenger side of the unoccupied NPD SUV. Again, neither officer was hit by the sedan and the backing in fact moved the sedan further away from Defendant Morrison than it had been. The sedan paused for a second after hitting the NPD SUV.

33. Defendant Morrison then ran across the driveway to the side of the driveway where the passenger side of the sedan had been.

34. Michael pulled the car forward for a second time into the driveway. Defendant Morrison was now standing near the back of the sedan about 6 feet away from the rear of the sedan on the passenger's side.

35. Neither officer had been struck by Michael's first two attempts to back the sedan out of the driveway and had sufficient time to position themselves out of the path of the vehicle.

36. Michael had now twice backed the car toward the gap left by the unoccupied NPD SUV after having more than once pointed backwards to indicate he was going to back up.

37. Defendant Morrison and Mr. Tracy were well aware Michael was trying to back out, and Defendant Morrison had positioned himself far enough from the passenger side of the sedan that he could easily keep himself out of the path of the backing vehicle.

38. The officers had the time during these two attempts at backing the car out of the gap to position themselves well out of the way of the car but chose instead to stay

relatively close to the vehicle, though beside the vehicle (not behind it) so that they could not be struck.

39. Despite knowing Michael was trying to back the sedan out of the gap, despite being in a position where he could easily keep himself from being hit by the sedan, and despite having had plenty of time during the previous two times the car backed up to position himself in a place where he could not be hit by the backing sedan, Defendant Morrison chose to move directly behind the car and into the gap that Michael had twice tried to back through. At about the same time, Michael began his third attempt to back the car through the gap.

40. Despite choosing to move directly into the gap he knew the sedan was trying to back through, Defendant Morrison still positioned himself such that he was not hit by the sedan as it backed for the third time.

41. Indeed, not only was Defendant Morrison able to avoid being hit by the sedan he was able to turn himself to face the car and fire approximately six rounds into the backing car (containing the four-year-old boy) while he back peddled to a position beside the car where he could not be struck. While Defendant Morrison was shooting into the car, the car backed through the gap and came to a stop or near stop on Third Street facing down the hill on Third Street near the end of the driveway.

42. Once the car stopped backing, or was nearly stopped, Defendant Morrison was not behind the car but had positioned himself about ten feet from the car on the driver's side.

43. After Defendant Morrison fired his first six shots into the vehicle and the vehicle came to a stop or near stop after backing onto Third Street, Defendant Morrison was positioned on the driver's side of the vehicle (not behind it or in front of it) where he was in no danger whatsoever of being struck by the vehicle. He then fired two additional shots at Michael while standing still in a position of complete safety.

44. Defendant Morrison shot eight rounds into the car containing Michael and his four-year-old son.

45. Shrapnel or flying debris caused by Defendant Morrison's gun shots injured Nelsonville Police officer Mr. Tracy.

46. Flying debris, mainly glass fragments, caused by Defendant Morrison's gun shots injured Michael's four-year-old son.

47. Defendant Morrison injured his own left arm as a result of flying debris from his aforementioned gun shots.

48. Michael, who had been hit multiple times by Defendant Morrison's gun shots briefly drove the sedan forward, away from Defendant Morrison and downhill on Third Street, before he lost consciousness and the car went off the road into a neighboring lawn and came to a stop.

49. Plaintiff Michael D. Whitmer was taken to OhioHealth O'Bleness Hospital by Athens County EMS and was declared dead there.

50. Michael did not die immediately upon being shot by Defendant Morrison but briefly remained conscious and suffered great pain and suffering from his injuries.

51. A postmortem examination of Michael's body performed by the Montgomery County, Ohio Coroner determined Michael's cause of death was "Multiple gunshot wounds".

52. At no time during the events described above was Michael armed with a weapon.

53. At all times during events described above Defendant Morrison was able to choose to position himself so as to be out of danger from the backing Chevrolet sedan.

54. Any danger to Defendant Morrison from the backing Chevrolet sedan was a result of Defendant Morrison unreasonably and without necessity choosing to position himself behind the sedan he knew was trying to back out, rather than choosing to position himself where he could not be struck by the backing sedan.

55. Even after unreasonably and unnecessarily choosing to position himself behind the backing sedan, Mr. Morrison was not only able to avoid being struck by it but was able to fire six shots into the vehicle while back peddling.

56. Had Defendant Morrison chosen not to back peddle and shoot into the car he could even more easily have gotten out of the way of the backing car than he did.

57. The shots Defendant Morrison fired at Michael constituted the use of deadly force.

58. Defendant Morrison's use of deadly force to seize Michael's person was unreasonable.

59. Defendant Morrison was not justified in using deadly force on Michael by a significant threat of death or serious physical injury to himself.

60. The use of deadly force to prevent the escape of a suspect is constitutionally unreasonable.

61. Defendant Morrison was not justified in using deadly force on Michael to prevent Michael from escaping from Defendant Morrison.

62. Defendant Morrison negligently, recklessly, wantonly, knowingly, intentionally, and maliciously used deadly and excessive force on Michael by shooting him to death without legal justification. He further used said deadly and excessive force in bad faith.

63. Defendant Morrison owed Michael a duty of reasonable care which he breached by shooting him to death.

64. Defendant Morrison's breach of his duty of reasonable care to Michael was the direct and proximate cause of Michael's pain and suffering and of his death.

65. Defendant Morrison is not entitled to political subdivision immunity from the state law claims herein because his political subdivision immunity is abrogated pursuant to R.C. §§ 2744.02 and 2744.03(A)(6)(b) given that Defendant Morrison acted with malicious purpose, in bad faith, and/or in a wanton and/or reckless manner.

66. Defendant Morrison is not entitled to qualified immunity because Defendant Morrison's use of deadly and excessive force described in this Complaint violated Michael's clearly established rights under the Fourth Amendment to the United States Constitution.

67. Defendant Morrison violated Michael's rights under the Fourth and Fourteenth Amendments to the United States Constitution when he unreasonably used deadly force and killed Michael in order to seize Michael's person.

68. As the direct and proximate result of the said acts of Defendant Morrison, Michael suffered the following injuries and damages:

    a. Violation of his constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from an unreasonable search and seizure of his person;

    b. Loss of his life;

    c. Physical pain and suffering and emotional trauma.

69. The actions of Defendant Morrison violated Michael's clearly established and well settled federal constitutional rights, as follows:

    a. Freedom from the unreasonable seizure of his person;

    b. Freedom from the use of excessive, unreasonable and unjustified force against his person.

## Count I
## 42 U.S.C. § 1983-Wrongful Death

70. All preceding paragraphs are incorporated herein by reference as though fully set forth.

71. Plaintiff Chelsea O'Brien claims damages for the wrongful death of Michael and for her loss and for the loss of Michael's dependent children, parents, and next of kin of Michael's income, support, services, protection, care, assistance, society, companionship, consortium, attention, advice, comfort, guidance, counsel, instruction, training, and education, and for funeral and burial expenses under 42

U.S.C. § 1983 and the Ohio wrongful death statues. See O.R.C §§ 2125.01 – 2125.04.

## Count II
## 42 U.S.C. § 1983-Survival Action

72. All preceding paragraphs are incorporated herein by reference as though fully set forth.

73. Michael was forced to endure great conscious pain and suffering, and to be attended to by physicians and other medical professionals, and to incur expenses for such medical treatment before his death.

74. Michael filed no action during his lifetime, but under the law of the State of Ohio this action survives and may be asserted by his Estate.

75. Plaintiff Chelsea O'Brien claims damages for the conscious pain and suffering and necessary medical expenses incurred by Michael, under 42 U.S.C. § 1983.

## Count III
## Assault and Battery-Wrongful Death

76. All preceding paragraphs are incorporated herein by reference as though fully set forth.

77. Defendant Morrison assaulted and battered Michael.

78. Plaintiff Chelsea O'Brien claims damages for the wrongful death of Michael and for her loss and the loss of Michael's dependent children, parents, and next of kin of Michael's income, support, services, protection, care, assistance, society, companionship, consortium, attention, advice, comfort, guidance, counsel, instruction, training, and education, and for funeral and burial expenses under the

13

common law of the State of and the Ohio wrongful death statues. See O.R.C §§ 2125.01 – 2125.04.

## Count IV
## Assault and Battery-Survival Action

79. All preceding paragraphs are incorporated herein by reference as though fully set forth.

80. Defendant Morrison assaulted and battered Michael.

81. Michael was forced to endure great conscious pain and suffering, and to be attended to by physicians and other medical professionals, and to incur expenses for such medical treatment before his death.

82. Michael filed no action during his lifetime, but under the law of the State of Ohio this action survives and may be asserted by his Estate.

83. Plaintiff Chelsea O'Brien claims damages for the conscious pain and suffering and necessary medical expenses incurred by Michael, under Ohio law.

WHEREFORE, the plaintiff requests that this Court:

    a. Award compensatory damages to plaintiff against the defendant.

    b. Award the costs of this action to the plaintiff.

    c. Award reasonable attorney's fees and costs to the plaintiff.

    d. Award punitive damages to the plaintiff against the defendant.

    e. Award pre-judgment and post-judgment interest to the plaintiff against the defendant.

    f. Award such other relief as this Court may deem appropriate.

The plaintiff hereby demands a jury trial.

Respectfully submitted,

/s/ John P. Lavelle
Mr. John P. Lavelle – 0002815
Mr. Sky Pettey – 0072041
Attorneys for the Plaintiff

Lavelle and Associates
449 East State Street, First Floor
Athens, OH 45701
(740) 593-3348
(740) 594-3343
jlavelle@johnplavelle.com
sky@johnplavelle.com